IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-00314-RBJ

CLARENCE JAMES SHANKS, JR.,

      Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

      This matter is before the Court on review of the Social Security Administration ("SSA") Commissioner's decision denying claimant Clarence James Shanks, Jr.'s application for Supplemental Security Income ("SSI") and Social Security disability insurance ("SSDI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses the Commissioner's decision and remands for further analysis.

### I. STANDARD OF REVIEW

      A person is disabled within the meaning of the Social Security Act only if his physical and/or mental impairments preclude him from performing both his previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs.  In reviewing a final SSA decision, the District Court examines the record and determines whether it contains substantial evidence to support the decision and whether SSA applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).  The District Court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole."  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record."  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988).  Evidence is not substantial if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed.  *Winfrey*, 92 F.3d at 1019.

## II. BACKGROUND

### A. Factual Background

Mr. Clarence James Shanks, Jr. ("Mr. Shanks" or "claimant") was born on January 14, 1964.  ECF No. 16-3 at 2.  For Social Security purposes, he became an individual approaching advanced age on January 14, 2014, and he became an individual of advanced age on January 14, 2019.  20 C.F.R. §§ 404.1563(d),(e), 416.963(d),(e).  Mr. Shanks worked as a cook until sometime in 2013.  He also did intermittent work as a carpenter for about six months in 2016.  ECF Nos. 16-2 at 59, 64; 16-7 at 29.  He has suffered from a wide range of ailments, including osteoarthritis, degenerative disc disease, carpal tunnel syndrome, kidney stones, proctitis, alcoholic gastritis, polycythemia vera, slow urinary flow, hematuria, obesity, polysubstance

2

abuse, depression, and cognitive disorder.  *Id.* at 13–16.

### B.  <u>Procedural Background</u>

Mr. Shanks filed an application for disability insurance benefits ("DIB", also known as "SSDI") on February 28, 2017.  Claimant filed an application for SSI on May 8, 2017.  He originally alleged disability starting on April 1, 2013.  ECF No. 16-3 at 2, 4, 7.  Plaintiff later amended his alleged onset date to February 28, 2017.  ECF No. 16-5 at 35.  The agency denied Mr. Shanks' applications.  ECF No. 16-4 at 5.  He requested a hearing, and ALJ Judge Diane S. Davis held one on March 8, 2019.  ECF No. 16-2 at 32.  Claimant and a vocational expert testified at the hearing.  *Id.* at 39–81.

The ALJ issued an unfavorable decision on April 26, 2019, finding that Mr. Shanks was not disabled.  ECF No. 16-2 at 8–27.  Claimant filed an appeal with the Appeals Council on May 1, 2019.  The Appeals Council denied the appeal.  *Id.* at 2.  After having exhausted these administrative remedies, on February 6, 2020 Mr. Shanks filed this suit pursuant to 42 U.S.C. §§ 405(g), 1383(c).  ECF No. 1.  He submitted his opening brief on July 7, 2020.  ECF No. 17.  Defendant Commissioner for Social Security responded on August 7, 2020.  ECF No. 18.  Claimant filed his reply on August 13, 2020.  ECF No. 19.

### C.  <u>April 26, 2019 ALJ Decision</u>

ALJ Davis issued an unfavorable decision on Mr. Shanks' claims after evaluating the evidence according to the SSA's five-step process.  ECF No. 16-2 at 8–27.  At step one the ALJ found that claimant had not engaged in substantial gainful activity since February 28, 2017, the alleged onset date of his disability.  *Id.* at 13.  At step two the ALJ determined that Mr. Shanks had two severe impairments: osteoarthritis of the knees and degenerative disc disease of the

lumbar spine.  The ALJ also considered Mr. Shanks' other alleged impairments: carpal tunnel

syndrome, kidney stones, proctitis and alcoholic gastritis, polycythemia vera, issues with

urination flow, hematuria, rupture of his bicep tendon, fracture of his right fibula, illicit drug use,

obesity, possible colon cancer, depressive disorder, and cognitive disorder.  The ALJ found that

none of these alleged impairments was severe (and in fact found no evidence among claimant's

medical records that he had colon cancer at all).  *Id.* at 13–17.

The ALJ determined that claimant's carpal tunnel syndrome was not a severe impairment

because he underwent a carpal tunnel release in June 2016, he had experienced no issues since

recovery, and he was able to work as a carpenter following the surgery.  *Id.* at 13–14.  The ALJ

found that his kidney stones were not a severe impairment because he did not complain of pain,

and the stones were small and non-obstructive.  *Id.* at 14.  There was also no evidence of a

diagnosis among claimant's records requiring kidney dialysis, though claimant alleged having

had dialysis.  *Id.* at 15.  The ALJ found that Mr. Shanks' polycythemia vera was not a severe

impairment because there was no evidence it "functionally impacts" him.  Though claimant

testified that he postponed a knee operation due to the condition, the ALJ noted that he did not

provide an explanation for his failure to reschedule and had also stopped attending blood

drawing appointments used to treat the condition.  *Id.* at 14.  As for his urination problem, the

ALJ found it was not a severe impairment because he reported contradictory issues of both

initiating flow and stopping flow, and he had not rescheduled or completed a cystoscopy by the

time of the hearing.  *Id.*  The ALJ determined that rupture of claimant's long head biceps tendon,

partial thickness tear of the long head, and fracture of his right fibula were all acute problems

that had resolved by the time of the hearing.  The ALJ found that these issues did not meet the

4

12-month durational requirement for severe impairment.  *Id.* at 15.  The claimant's obesity did not constitute a severe impairment in the ALJ's opinion because his body mass index did not correlate with specific functional loss, and nothing in the record suggested to the ALJ that claimant's obesity significantly limited his ability to work.  *Id.*

In her decision the ALJ addressed claimant's substance use history.  She concluded that his proctitis and alcoholic gastritis—both related to his alcohol use—were not severe impairments because he received medications for them, and a colonoscopy "showed only hemorrhoids and one benign polyp, which was removed."  *Id.* at 14.  She also wrote that claimant "did not have any complaints related to these impairments at the time of the hearing," and that the record did not establish that they cause more than a minimal limitation in his ability to perform basic work activities.  *Id.*  The ALJ noted "illicit drug use" based on two positive drug tests dated four months apart: one for methamphetamine in February 2018, and one for MDMA and methamphetamine in June 2018.  *Id.* at 15.  The ALJ noted that claimant tested negative for Oxycodone, which he was prescribed, on both of these test dates.  The ALJ concluded that "it appears as though the claimant was continuing to use illicit drugs," but that "there is no evidence that his use functionally impacts him."  *Id.*

Finally, the ALJ concluded that Mr. Shanks' alleged depressive disorder and cognitive disorder were not severe impairments either individually or jointly.  *Id.* at 16.  She found that he had only mild limitations in each of the four areas of mental functioning (the "paragraph B" criteria).  For understanding, remembering, or applying information, the first area, claimant reported needing daily reminders to take medication, and the consultative examination showed impairment in short-term auditory memory and fund of knowledge.  *Id.*  However, the ALJ

concluded that the limitation was only mild because treatment notes showed he had normal memory, orientation, language, fund of knowledge, and good insight and judgment, and claimant did well on other parts of the consultative examination. *Id.* The ALJ found that claimant had only a mild limitation in the second function area, interacting with others. Though he told the consultative examiner that he gets irritable and agitated, medical records indicated he is pleasant, very cooperative, and non-argumentative. The ALJ also noted that Mr. Shanks gets along with authority figures, that he spends time with family, that he goes out shopping and attends church, and that he has never lost a job due to inability to get along with others. *Id.*

On concentrating, persisting, or maintaining pace, the third functional area, the ALJ found a mild limitation because treatment notes showed that Mr. Shanks had a normal attention span and concentration, and at the consultative examination he made one mistake and took twenty-seven seconds to count to forty by threes. *Id.* Finally, in the fourth functional area, adapting or managing oneself, the ALJ also found a mild limitation. While she noted that claimant reported getting easily flustered and confused with stress, and that he appeared anxious and depressed at the consultative examination, she found this evidence outweighed by evidence that his hygiene and grooming were adequate, that he reported handling routine changes okay, and that treatment notes reported an appropriate mood and affect at appointments. The ALJ again pointed to the limited mental health complaints at treatment appointments. *Id.*

In making her determination on claimant's depressive disorder and cognitive disorder, the ALJ considered the opinions of the consultative examiner Richard Madsen, Ph.D. and the state agency psychological consultant Gayle Frommelt, Ph.D. With respect to Dr. Madsen's assessment she wrote, "it is clear that the consultative examiner was relying on the claimant's

6

subjective reports with no substantiation" because of the following: the claimant was not taking medications for depression as directed; no psychiatric drug such as Wellbutrin or Duloxetine was listed on his recent medication list; his treatment notes show no evidence of neurocognitive disorder; and he "was able to work as a line cook for many years without issue." *Id.* Dr. Madsen concluded that Mr. Shanks was impaired at a moderate or marked level in areas like consistently performing detailed and complex tasks, performing repetitive tasks, maintaining workplace attendance, completing a normal workday, and dealing with regular workplace stress. *Id.* at 17–18. The ALJ gave little weight to this opinion because Dr. Madsen based it on a one-time consultative examination, he did not treat claimant over time, and he did not consider "claimant's illicit drug or alcohol use." *Id.* at 18.

The ALJ then noted Dr. Frommelt's conclusion that Mr. Shanks had moderate (instead of mild) limitations in three of the four mental functioning areas, including interacting with others, and that claimant could have only occasional interaction with the general public. *Id.* The ALJ also assigned little weight to her opinion because it was based on the one-time consultative examination, and because she deemed it unsupported by treatment notes, particularly with respect to claimant's alleged social limitations. *Id.*

After her discussion on Mr. Shanks' mental impairments, the ALJ found at step three that neither of claimant's severe impairments met or medically equaled the severity of a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* at 19. The ALJ found that claimant's knee osteoarthritis did not meet the 1.02A listing for "major dysfunction of a joint" because that listing requires an inability to ambulate effectively, such as inability to walk without a walker, two crutches, or two canes. The ALJ found that claimant "does not have an inability to ambulate

ineffectively." *Id.* The ALJ also concluded that claimant's lumbar spine degenerative disc disease did not meet the 1.04 listing for "disorders of the spine." She based her conclusion on the lack of evidence in the record of sensory or reflex loss and a positive straight-leg raising test for 1.04A, as well as no evidence for paragraphs B or C of 1.04. *Id.*

The ALJ then analyzed Mr. Shanks' residual functional capacity at step four. She determined that he had the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). *Id.* As summarized by the ALJ, Mr. Shanks reported being in constant pain and discomfort, with his conditions affecting his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, and use his hands. He reported his doctor prescribing both knee surgery and back surgery, and he indicated that he has a cane and a crutch. He gave specific examples of how his pain bothers him. *Id.* at 20. The ALJ summarized medical records related to his two severe impairments. *Id.* at 20–24.

In addressing his knee problem, the ALJ focused on his failure to follow through with physical therapy or to initially get injections, and the normal gait, normal neurological findings, and ability to bear weight fully on his legs. She also pointed to that fact that his knee injury arose from work laying carpet that "he was not forthcoming about at the hearing." *Id.* at 24. In addressing Mr. Shanks' lower back condition the ALJ noted that he was scheduled for back surgery, but that it was cancelled. She drew the conclusion that the cancellation was due to claimant's use of illicit drugs, despite claimant's denying this and testifying that it was cancelled due to his need to get knee surgery first. *Id.* at 24–25.

Based on this review the ALJ concluded that while Mr. Shanks' impairments could be expected to cause his alleged symptoms, his statements on the "intensity, persistence, and

limiting effects of his symptoms are inconsistent with the record as a whole." *Id.* at 24.  In her reasoning on claimant's RFC, she noted the following: his wife had also applied for disability, so "it is unclear who is helping who;" there were inconsistencies in claimant's unreported work; and he "was not forthcoming about his drug use." *Id.* at 25.  She emphasized twice that his unreported work as a carpenter reflected that he could do work at the medium level.  *Id.*

At the end of her step four analysis the ALJ determined that Mr. Shanks was capable of performing his past relevant work as a line cook, a short order cook, and a food prep cook.  Line cook and food prep cook are considered medium exertion level positions, while a short order cook is associated with a light exertion level.  *Id.* at 26.  The ALJ concluded based on vocational expert testimony and the job definitions that claimant could do all three of these jobs because she had found him capable of the full range of medium work.  *Id.* at 26–27.  Therefore, the ALJ determined that claimant was not disabled and denied him benefits.  *Id.* at 27.

### III. ANALYSIS

Mr. Shanks seeks review of the ALJ's April 26, 2019 decision.  He argues that the ALJ made three errors in her determination: (1) the ALJ failed to include all limitations she found credible in her RFC finding; (2) the ALJ improperly substituted her own lay opinion for that of the mental and physical medical opinions; and (3) the ALJ treated claimant's polysubstance abuse inconsistently in her analysis by failing to properly assess its impact on his ability to perform work while also penalizing him on the basis of the condition.  ECF No. 17 at 2–3; *see also* ECF No. 19.  Defendant counters that the ALJ's decision is supported by substantial evidence and should not be reversed.  ECF No. 18.  I address each of the alleged errors in turn.

### A.  The ALJ's RFC determination

Mr. Shanks asserts that the ALJ failed to account for all of the functional limitations caused by all of his impairments when she formulated her RFC finding.  Specifically, claimant argues that the ALJ failed to consider (1) his need to use a cane, and (2) his depressive disorder and cognitive disorder.  ECF No. 17 at 3–4.

The Commissioner's regulations make clear that an ALJ must consider *all* impairments, whether severe or non-severe, in assessing a person's RFC.  20 C.F.R. § 404.1545(a)(2) reads "[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."  Further on, the same regulation states that "[w]hen you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your [RFC]."  20 C.F.R. § 404.1545(e).  The leading Social Security Ruling ("SSR") on the issue says the same:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."  While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.

SSR 96-8P, 1996 WL 374184 (July 2, 1996).

Claimant argues that the ALJ noted his use of a cane and that a treating physician told him to use it, but then she failed to properly account for the cane in her RFC analysis.  According to Mr. Shanks, "[a]gency policy recognizes that the use of a cane is, at best, consistent with

sedentary work."  ECF No. 17 at 3.  The ALJ's determination that Mr. Shanks could perform

work at a medium level is thus necessarily wrong, he contends.  I disagree.  Claimant supports

his assertion by citing to SSR 96-9p.  But that decision explains

> To find that a hand-held assistive device is medically required, there must be medical
> documentation establishing the need for a hand-held assistive device to aid in walking or
> standing, and describing the circumstances for which it is needed (i.e., whether all the
> time, periodically, or only in certain situations; distance and terrain; and any other
> relevant information). *The adjudicator must always consider the particular facts of a
> case*.

SSR 96-9P, 1996 WL 374185 (July 2, 1996) (emphasis added).

Here, the ALJ properly analyzed the particular facts of Mr. Shanks' case.  The ALJ

mentioned a cane on two occasions: she wrote "[claimant] testified that he has a cane and a

crutch," and later she noted "Dr. Waskow told the claimant to get a brace and cane."  ECF No.

16-2 at 20, 22.  She also analyzed the history of claimant's knee osteoarthritis extensively in her

RFC analysis, and the cane was only one part of his treatment plan.  *Id.* at 19–24.  She

considered medical evidence that mentioned strength in his legs, no knee or ankle instability,

normal gait, and "no apparent limitations in mobility."  *Id.* (citing ECF Nos. 16-8 at 17–20; 16-

10 at 64–76; 16-11 at 57, 62.  Furthermore, at the hearing before the ALJ Mr. Shanks testified

that he owns a cane and a crutch, and he uses the crutch "once in a while."  ECF No. 16-2 at 49.

Under the regulations and SSR 96-8P the ALJ must consider every impairment and functional

limitation—she need not consider each individual treatment or solution to a functional limitation.

And as SSR 96-9P explains, for an assistive device such as a cane or crutch to be medically

required, medical records must describe the circumstances for which it is needed.  That was not

the case here.  Even assuming, as claimant argues, that use of a cane is consistent only with

sedentary work, the record does not indicate that Mr. Shanks regularly used a cane or crutch.

Substantial evidence supports the ALJ's finding that Mr. Shanks' mobility is not limited.  I find

that the ALJ sufficiently considered Mr. Shanks' use (or non-use) of a cane, and his overall

mobility, in her RFC analysis.  Remand is not required on this ground.

Mr. Shanks next maintains that the ALJ failed to include any mental impairments in her

RFC determination, despite her finding at step two that he suffered from the non-severe

impairments of cognitive disorder and depressive disorder.  ECF No. 17 at 4; ECF No. 16-2 at

16.  In response the Commissioner argues that because the ALJ found these impairments did not

"significantly limit" his ability to perform basic work activities, she did not have to include

corresponding mental functional limitations in her RFC assessment.  ECF No. 18 at 9.

According to defendant, the ALJ needed only to consider the "combined effect" of all claimant's

impairments.  *Id.*

I agree with claimant that the ALJ failed in her duty to consider all impairments in her

RFC analysis.  While it is true that in her RFC assessment she need not have explicitly addressed

every symptom, every treatment, or every record in which his mental impairments were raised,

she had to address them to some extent.  And she did not.  At the beginning of her RFC analysis

the ALJ generically states that she has "considered all symptoms and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence . . . ."  ECF No. 16-2 at 19.  However, she then analyzed claimant's RFC based

only on his reports of pain and medical records related to his severe impairments—osteoarthritis

of the knees and degenerative disc disorder.  *Id.* at 20–24.  With the exception of carpal tunnel

syndrome, ECF No. 16-2 at 21, nowhere did the ALJ mention, much less analyze, *any* of

claimant's non-severe impairments that could have an effect on his functional capacity.  Among

the impairments that the ALJ failed to mention or analyze are his cognitive disorder and depressive disorder, as well as the mild limitations she found in all four mental functional areas.

"A claimant's mental impairment must also be evaluated in combination with the effects of other impairments" when determining his or her RFC. *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991). The court in *Hargis* also concluded that the Commissioner must consider all impairments in determining if their combined effect results in a disability, which in turn requires support from a vocational expert who must be asked about all functional limitations. *Id.* at 1492. Here the ALJ neither questioned the vocational expert about the effect Mr. Shanks' mental impairments would have on the type of work he could do, nor did she consider his mental impairments in her RFC determination overall. ECF No. 16-2 at 19–25, 77–79.

The Commissioner also argues that the ALJ did not need to include mental functional limitations in the RFC finding because she concluded that his mental impairments did not significantly limit his ability to work. ECF No. 18 at 9. Defendant notes that the ALJ found plaintiff capable of returning to his former unskilled work. He writes "[t]he Tenth Circuit has repeatedly recognized that even 'severe' mental impairments and moderate limitations in one or more domains do not necessarily require limitations in the RFC finding when the individual can perform unskilled work." *Id.* at 10. Defendant supports this proposition with three cases. But in all three the ALJ *did* address mental impairments as part of the RFC assessment, unlike here.

In *Vigil v. Colvin*, the court found that the ALJ's limiting claimant to an SVP of two (unskilled worked) based on the deficiency in a single mental functioning area was sufficient. 805 F.3d 1199, 1203–04 (10th Cir. 2015). However, the ALJ had explicitly addressed the mental functioning limitations in the RFC analysis, because at step four "the ALJ found some evidence

indicating that Vigil had some problems with concentration, persistence, and pace" such that the claimant could not perform complex tasks. *Id.* Similarly, in *Hernandez v. Colvin* the ALJ recognized in his RFC assessment that claimant could only do unskilled work because of a cognitive dysfunction or learning disorder. 567 F. App'x 576, 582 (10th Cir. 2014) (unpublished). The issue the claimant raised was whether the ALJ needed to specify which part of an expert's mental health assessment he relied on for the RFC analysis, not whether the RFC analysis failed to consider mental impairments at all. *Id.* Finally, in *Bales* the ALJ did not directly import the mental limitations into the RFC determination, but in assessing claimant's RFC the ALJ did "rel[y] on the consultants' mental RFC opinions, incorporating the most restrictive mental RFC limitations suggested." *Bales v. Colvin*, 576 F. App'x 792, 798 (10th Cir. 2014) (unpublished).

By contrast, here the ALJ did not mention or assess mental impairments in her RFC determination. Furthermore, two of those cases actually recognize that "[a]n ALJ's limitation to 'unskilled' work may not, under certain facts, adequately address a claimant's mental limitations," citing to *Chapo v. Astrue*, 682 F.3d 1285, 1290 n. 3 (10th Cir. 2012). *Bales*, 576 F. App'x at 798; *Vigil*, 805 F.3d at 1204. Had the ALJ here concluded that Mr. Shanks could only do unskilled work based on his mental impairments, these cases suggest that I should defer to such an analysis. But here the ALJ came to no such conclusion, nor could she have, because she failed to consider mental impairments in her analysis at all. With the exception of carpal tunnel syndrome, she also failed to analyze any of claimant's other non-severe impairments in her RFC determination (kidney stones, proctitis and alcoholic gastritis, polycythemia vera, issues with urination flow, hematuria, rupture of his bicep tendon, fracture of his right fibula, illicit drug use,

and obesity).  ECF No. 16-2 at 19–25.

Because the ALJ's determination of Mr. Shanks' RFC failed to consider all of his impairments, including non-severe ones, it was legally flawed.  It thus cannot be said to rest on substantial evidence.  *Winfrey*, 92 F.3d at 1019.  The Court reverses the ALJ's decision on this basis and remands for a proper RFC analysis that considers all of Mr. Shanks' impairments, particularly his mental impairments of depressive disorder and cognitive disorder.  The ALJ must also include all limitations when questioning the vocational expert.  *Hargis*, 945 F.2d at 1492.

### B.  The ALJ's consideration of mental and physical medical opinions

The next error Mr. Shanks alleges is that the ALJ substituted her own lay opinion for the opinions of the medical experts in the record, i.e. those rendered by Dr. Aaron Snyder, Dr. Richard B. Madsen, and Dr. Gayle Frommelt.  Claimant also contends that the ALJ failed to develop the record in support of her own conclusion.  ECF No. 17 at 7.

RFC determination is an administrative assessment, and the final responsibility for determining RFC rests with the Commissioner.  20 C.F.R. § 404.1527(d)(2), 404.1545.  It is based upon all the evidence in the record, not just the relevant medical evidence.  *Id.*  When assessing a medical opinion an ALJ must consider the extent to which the medical source provides relevant evidence to support his or her opinion, as well as the extent to which a medical opinion is consistent with the record as a whole.  20 C.F.R. § 416.927(c)(3-4).  Generally, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence."  *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)).  However, an ALJ may not second-guess a medical expert's judgment or substitute his or her own judgment for that of a medical expert's.  *Winfrey*, 92 F.3d

at 1022–23.

Claimant takes issue first with the ALJ's rejection of Dr. Snyder's opinion on his physical functional capacity. Dr. Snyder is the agency reviewing physician. He did a residual functional capacity assessment of Mr. Shanks and concluded that he would be limited to light work with limited fingering bilaterally due to his carpal tunnel syndrome. ECF No. 16-3 at 15–16, 25–37. The ALJ instead found that claimant could perform the full range of medium, not light work. She afforded little weight to Dr. Snyder's conclusion because he "based his opinion on the then-recent issue involving carpal tunnel." ECF No. 16-2 at 25. Claimant contends that the ALJ failed to support her rejection of Dr. Snyder's opinion with even "a shred of medical opinion evidence," and that this constituted legal error. ECF No. 17 at 7.

I disagree with claimant. Here, the ALJ got the final say as to Mr. Shanks' RFC. At the time of his assessment on August 30, 2017 Dr. Snyder reported that Mr. Shanks had undergone a right carpal tunnel release, "which he tolerated well and has recovered," while he had not yet undergone release on the left side. *Id.* at 16. But the ALJ pointed to numerous medical records indicating that claimant had undergone carpal tunnel releases in both wrists and had recovered well, including records from after Dr. Snyder's assessment. ECF No. 16-2 at 25; *see also* ECF Nos. 16-8 at 79; 16-9 at 119–120; 16-10 at 64–68. I have found additional such evidence in the record. *E.g.* ECF No. 16-12 at 4. To the extent it considers claimant's carpal tunnel syndrome, the ALJ's RFC assessment was supported by substantial evidence in the record even if it differs from Dr. Snyder's. There need not be an identical RFC determination from a medical practitioner in order for an ALJ's RFC determination to be valid—to require this would defy the point of an ALJ assessing the residual functional capacity of a claimant. The ALJ did not reject

a diagnosis, interpret raw medical data, or otherwise second-guess Dr. Snyder.  She simply found that evidence post-dating the physician's assessment showed that the particular limitation on which Dr. Snyder based his opinion was no longer present.  I therefore find that the ALJ did not improperly substitute her own opinion for that of Dr. Snyder's.

I come to a different conclusion with respect to the ALJ's treatment of the other expert opinions, however.  Mr. Shanks argues that the ALJ "rejected the mental medical opinions of both SSA's own doctors," Dr. Madsen and Dr. Frommelt, and that she concluded claimant's mental impairments were less severe without citing to contrary medical opinions.  ECF No. 17 at 8–9.  In his response brief defendant barely addresses this argument, writing only that "the ALJ fully evaluated the opinions of Drs. Madsen and Frommelt that Plaintiff was more limited, providing good reasons for giving those opinions little weight."  ECF No. 18 at 11.

Dr. Madsen evaluated claimant on September 27, 2017.  Under diagnostic impression he noted persistent depressive disorder and cognitive disorder.  ECF No. 16-10 at 52.  He concluded that claimant would have moderate to marked impairment in three areas (maintaining acceptable workplace attendance; performing work activities consistently; and completing a workday or workweek without interruptions), moderate impairment in interacting with small groups, and marked impairment in interacting with large groups.  *Id.* at 53.  Dr. Madsen also determined that claimant would be markedly impaired in performing detailed and complex tasks and moderately impaired in performing simple repetitive tasks, that he would require additional supervision, and that he would have difficulty remembering instructions from supervisors.  *Id.*  In her assessment, Dr. Frommelt did not contest the cognitive and depressive disorder diagnoses.  *Id.* at 12.  However, she found overall that claimant's limitations were milder than Dr. Madsen assessed.

*Id.* at 17–18; *see also* ECF No. 16-2 at 22 (ALJ's summary of Dr. Frommelt's assessment).

The ALJ accorded little weight to Dr. Madsen's opinion because he based his opinion on a one-time examination and lacked longitudinal treatment history with claimant.  She specifically rejected his diagnosis of cognitive disorder because "there is no evidence of the claimant having a cognitive disorder in any of the treatment notes."  ECF No. 16-2 at 22.  The ALJ also gave little weight to Dr. Frommelt's opinion because she based it on the one-time consultative examination, and it had "no support" in the treatment notes.  But Dr. Madsen's own opinion recognized that claimant had not sought mental health treatment prior to his assessment, and he reviewed Mr. Shanks' treatment records and still found a cognitive disorder diagnosis.  ECF No. 16-10 at 51–52.  Dr. Frommelt agreed with Dr. Madsen's diagnoses.  And she too based her opinion on the "objective records" and accounted for claimant not formally alleging mental health impairments.  ECF No. 16-3 at 12.  The records that the ALJ pointed to in support of her conclusion do not contradict Dr. Madsen's observations, particularly about claimant's depression.  *See* ECF No. 16-10 at 57–67.  Furthermore, later records from 2018 and 2019 are also consistent with these physicians' opinions.  *E.g.* ECF Nos. 16-11 at 29-33; 16-12 at 2–3, 15.

I find that with respect to claimant's mental impairments, the ALJ substituted her lay opinion for that of the two SSA medical experts.  This case is similar to decisions in which courts have reversed an ALJ on this basis.  For example, in *Winfrey* the Tenth Circuit reversed a denial of benefits because the ALJ rejected a mental health professional's diagnosis based on his own interpretation of medical data, which the court found impermissible.  *Winfrey*, 92 F.3d at 1022–23.  Similarly, in *Miranda v. Barnhart* the court reversed an ALJ's decision because the ALJ "'second-guessed' [a physician's] diagnosis by discounting his assessment primarily

because it was based on [claimant's] sometimes inconsistent, subjective statements."  205 F.

App'x 638, 641 (10th Cir. 2005) (unpublished).  The court explained that

> The practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements.  [The physician's] opinion indicates he was fully aware of inconsistencies in [claimant's] statements, and he rendered his opinion in light of that knowledge.  The ALJ's approach impermissibly put him in the position of judging a medical professional on the assessment of medical data, in this case [claimant's] statements.  It is not the ALJ's prerogative to substitute his own judgment for that of [the physician].

*Id.*

Here, the ALJ has likewise substituted her own judgment for that of Drs. Madsen and

Frommelt.  She wrote that "treatment notes show that claimant has normal memory, orientation,

language, fund of knowledge, attention, and concentration," and that he is "pleasant, cooperative,

and non-argumentative."  ECF No. 16-2 at 18.  But in so writing she points to records from only

three visits, one of which was for a pain medication refill and the others of which involved a

neurological exam for purposes of spinal surgery—visits that neither serve the same purpose nor

would gather the same information as a cognitive and mental health evaluation.  ECF Nos. 16-10

at 60, 67; 16-11 at 2.  She points to no expert opinion in claimant's records, nor have I found

one, that assesses claimant's mental and cognitive state and that comes to a different conclusion

that those of Drs. Madsen and Frommelt.

In essence, the ALJ swapped out the informed expert opinion of these physicians for her

own interpretation of raw medical data related to claimant's mental state.  She assigned little

weight to Dr. Madsen's diagnoses and perspective on claimant's mental limitations even though

he examined Mr. Shanks directly; his opinion was largely corroborated by Dr. Frommelt's; and

there was no conflicting opinion from any other medical professional (treating or non-treating) in

the record.  She also gave Dr. Frommelt's opinion little weight despite, again, no conflicting medical opinion in the record.  I am further concerned by the ALJ's focusing on Dr. Madsen's failure to consider claimant's alcohol or illicit drug use in his evaluation.  It is unclear why this supports rejecting an examining physician's opinion, and the number of times the ALJ mentions this substance use suggests an improper bias by the ALJ against claimant.

At a minimum, if the ALJ did not believe that there was sufficient evidence in the record regarding claimant's diagnoses and general mental health, she had a duty to further develop the record before rejecting these expert opinions.  *See* 20 C.F.R. § 404.1512(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . ."); *Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."); *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir. 1993) ("The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.").  It appears that here the ALJ disagreed with both experts and opted to form her own opinion based on limited, raw medical data instead of seeking additional medical expert assessments of Mr. Shanks.

Having come to this conclusion, I next address whether this error was harmless.  An error is harmless where, "based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).  In Mr. Shanks' case a different ALJ could have found that the opinions of Drs.

Madsen and Frommelt (which are largely uncontroverted) were entitled to greater weight, and that claimant's mental limitations were more substantial than the ALJ determined. The evidence thus supports requiring an ALJ to assess functional limitations from Mr. Shanks' impairments in his or her RFC determination (something the ALJ should have done in any case, as discussed in section III.B above). The error here was not harmless. *Cf. Alvey v. Colvin*, 536 F. App'x 792, 794–95 (10th Cir. 2013) (unpublished) (holding that ALJ's failure to conduct a more particularized assessment of mental functions at step four was harmless because the evidence did not support assessing functional limitations from mental impairments). The Court thus remands for the ALJ to reconsider greater functional limitations from Mr. Shanks' mental impairments, or to further develop the record on his mental impairments through additional medical expert consultations and testimony.

### C.  <u>The ALJ's assessment of claimant's polysubstance abuse</u>

The third legal error Mr. Shanks contends is that the ALJ improperly addressed his polysubstance abuse throughout her decision. He argues that she failed to conduct the requisite drug addiction and alcoholism ("DAA") analysis under 20 C.F.R. §§ 404.1535, 416.935, and also that she unfairly penalized him by concluding that he was unable to comply with treatment due to his polysubstance abuse. ECF No. 17 at 11.

A reminder of how the ALJ addressed claimant's drug and alcohol use in her opinion is beneficial here. Under step two, she considered the effects of his alcohol use (proctitis and alcoholic gastritis) and concluded that these impairments were not severe. ECF No. 16-2 at 14. She also mentioned the two instances of Mr. Shanks' illicit drug use, and she again concluded that this use did not constitute a severe impairment. *Id.* at 15. Then, under step four the ALJ

concluded that claimant could perform the full range of medium work in part because he had cancelled his knee surgery, according to her, due to his illicit drug use in June 2018. *Id.* at 23. Finally, in summarizing other reasons for her RFC assessment the ALJ stated "the claimant was not forthcoming about his drug use" (though the ALJ nowhere indicates when or where in the record claimant was not forthcoming). *Id.* at 25.

With respect to the alleged failure to conduct the DAA analysis, defendant responds that no DAA analysis was required. I concur. The regulation on DAA reads in relevant part, "[i]f we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535. The Tenth Circuit explained when and how the DAA analysis operates in *Drapeau*. It wrote "a finding of disability is a condition precedent to an application of § 423(d)(2)(C)," which states that an individual will not be considered disabled if alcoholism or drug addiction would be a contributing material factor to that determination. *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001). "The Commissioner must first make a determination that the claimant is disabled. He must then make a determination whether the claimant would still be found disabled if he or she stopped abusing alcohol." *Id.* (internal citations omitted). As Mr. Shanks' own brief recognizes, the ALJ did not analyze whether his substance use was material to his disability because she found that he was not disabled. Thus, the ALJ was not required to conduct a DAA analysis as claimant urges.

Mr. Shanks also takes issue with how the ALJ addressed his illicit drug use in her RFC determination. He contends that the ALJ "penalized" him by highlighting that he was unable to comply with treatment due to his polysubstance use. ECF No. 17 at 11. Mr. Shanks points to

SSR 82-59, which sets out a procedure the Commissioner must follow in order to use a claimant's failure to obtain treatment or non-compliance with treatment as a basis for finding a claimant is not disabled.  The introduction to that SSR states "[i]ndividuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment."  SSR 82-59, 1982 WL 31384 (Jan. 1, 1982).  It requires that before the Social Security Administration deny a claim on this basis, it must find that treatment is prescribed by a treating source, would restore the person's ability to work, and was intentionally not followed without justifiable reason, or it must provide the claimant with the opportunity to follow the prescribed treatment.  *Id.*

In this Circuit, failure to pursue treatment related to this SSR is analyzed under the *Frey* test.  It considers factors almost identical to those in the SSR: "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987); *see also Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).  In *Qualls* the Tenth Circuit clarified when the *Frey* test needed to be applied.  *Frey* "concerned the circumstances under which an ALJ may deny benefits because a claimant has refused to follow prescribed treatment."  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (citing *Frey*, 816 F.2d at 517).  By contrast, *Frey* does not apply when an "ALJ properly consider[s] what attempts plaintiff made to relieve his pain—including whether he took pain medication—in an effort to evaluate the veracity of plaintiff's contention that his pain was so severe as to be disabling."  *Id.*  In a later case the Tenth Circuit put it as follows: "when, as

here, noncompliance with prescribed treatment is invoked not as independent [sic] basis for denying disability but only as a factor diminishing the credibility of a claimant's allegations of the severity of symptoms prompting the treatment, the ALJ need not also find the forgone treatment would have restored the claimant's ability to work." *Johnson v. Colvin*, 640 F. App'x 770, 774 (10th Cir. 2016) (unpublished).  In essence, *Frey* (and relatedly, SSR 82-59) applies when the failure to pursue treatment is central to a claim's denial, but not when it is used only to assess a claimant's credibility with respect to symptoms like pain.

The situation here is not like that in *Qualls* or *Johnson*, where the ALJ referenced claimant's failure to get treatment in order to assess the credibility of claimant's pain allegations. Instead, the ALJ referenced Mr. Shanks' failure to get back surgery as an effect of his illicit drug use.  ECF No. 16-2 at 25.  Defendant responds to this "penalization" argument by stating that the ALJ merely noted "inconsistencies in the record about why Plaintiff's back surgery was cancelled."  ECF No. 18 at 12.  This mischaracterizes the ALJ's position.  The ALJ explicitly concluded that "the records seem to suggest the back surgery was cancelled due to the drug use," and she spends more than ten lines linking the cancelled surgery to the positive drug tests.  ECF No. 16-2 at 24–25.  There is no question the ALJ drew negative inferences about claimant's ability or willingness to pursue treatment for his back problems based on his illicit drug use.  She then in turn denied his claim on the basis that his back and knee pain were not sufficiently impairing to his ability to work.

The ALJ's decision that claimant is not disabled thus was based in part on his failure to pursue treatment, i.e. not having back surgery.  I therefore find that *Frey* applies.  The ALJ should have assessed whether treatment would have restored Mr. Shanks' ability to work;

whether the treatment was prescribed; whether it was refused; and whether the excuse for refusing treatment was justified, or whether Mr. Shanks could have rectified the non-pursuit of treatment.  Without that analysis this Court cannot properly review whether the ALJ's denial of Mr. Shanks' claim is supported by substantial evidence.  This failure is reversible legal error. The Court remands for the ALJ to analyze Mr. Shanks' polysubstance use under *Frey* and to properly consider his polysubstance use as a functional limitation in the RFC determination.

Finally, I note that in her RFC determination the ALJ emphasized claimant's unreported work, that he and his wife had both applied for disability benefits, and that he "was not forthcoming" about his drug use.  ECF No. 16-2 at 25.  Though these factors may be relevant to her assessment of his credibility on pain, they should not have influenced her assessment of the work activity he is capable of performing, as they seem to have.

## ORDER

For the reasons described above, the Court REVERSES the Commissioner's decision denying Mr. Shanks' application for SSI and SSDI and REMANDS for reevaluation of the evidence consistent with this order.

DATED this 8th day of February, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge